WILLIAM B. KORSTAD AND DOROTHY A. KORSTAD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Korstad v. Commissioner
Docket No. 21392-81.
United States Tax Court
T.C. Memo 1983-147; 1983 Tax Ct. Memo LEXIS 642; 45 T.C.M. (CCH) 1032; T.C.M. (RIA) 83147; March 21, 1983. Charles O. Howard, for the petitioners. James C. Lanning, for the respondent. HAMBLEN
MEMORANDUM OPINION HAMBLEN, Judge: Respondent determined *644 a deficiency of $70,105.44 in petitioners' 1977 Federal income tax. The sole issue for decision is whether the receipt by petitioner of an irrevocable bank letter of credit constitutes payment within the meaning of section 453(b)[1] and thereby disqualifies petitioners from installment sale treatment. All of the facts have been stipulated and are found accordingly. William B. Korstad (hereinafter "petitioner") and Dorothy A. Korstad, husband and wife, resided in North Oaks, Minnesota, when they filed their petition in this case. Petitioners timely filed their 1977 joint Federal income tax return with the Internal Revenue Service Center, Ogden, Utah. On October 25, 1976, petitioner entered into a purchase agreement with Dot-Winslow Properties, Inc. (hereinafter "Dot-Winslow"), wherein petitioner [2] agreed to sell and Dot-Winslow agreed to buy certain real property located in Ramsey County, Minnesota. On September 20, 1977, the parties entered into an amendment and addendum to the original purchase agreement. This amendment reduced *645 both the acreage of the property to be purchased and the purchase price. Under this amended agreement, the total purchase price of $300,000 was to be paid as follows: $30,000.00 on closing and the balance of $270,000.00 to be paid in ten (10) equal annual installments, bearing interest at the rate of eight percent (8%) per annum on the unpaid balance, amortized in equal payments of principal and interest over said period of ten years, the first payment commencing January 2, 1978, and each January 2 thereafter until paid. * * * Buyer shall have no right of prepayment at any time. Dot-Winslow required that marketable title be conveyed to it at closing in order that it could subject the property to first mortgage construction financing. This requirement deprived petitioner *646 of the opportunity to retain a security interest in the property after closing. In the absence of a security interest in the property, petitioner wanted some other protection against default by Dot-Winslow. To this end, the terms of the amended agreement provided: Said installment payment shall be secured by an irrevocable letter of credit from a national bank acceptable to William Korstad. Pursuant to this requirement, Dot-Winslow arranged for the issuance of an irrevocable letter of credit by the First National Bank of Anoka, Anoka, Minnesota (hereinafter "the Bank").On October 14, 1977, the Bank issued its letter of credit in favor of petitioner. The annual amount specified in the letter of credit was $37,894.89, determined on the basis of the applicable amortization schedule. As a part of the letter of credit transaction, Dot-Winslow signed an unsecured demand note in the amount of $378,948.86 payable to the Bank. This note, dated October 14, 1977, bore an annual interest rate of 9 1/2 percent. It was extended by a second note of like terms and amount. This note, dated June 26, 1979, bore an annual interest rate of 12 1/2 percent. On December 29, 1981, the annual interest *647 rate on the second note was increased to 19 percent. The terms of the letter of credit authorized petitioner, or his duly authorized transferee: * * * to draw at sight upon the First National Bank of Anoka, on the second day of January, 1978, and each year on each January 2nd thereafter through and including January 2, 1987, the aggregate sum each year of Thirty seven thousand eight hundred ninety four and 89/100 ($37,894.89,) * * *. The letter of credit further required that sight drafts of petitioner be accompanied by a certified copy of the purchase agreement and the amendment therto, and also by a: Statement of William B. Korstad, dated January 2, 1978, and each January 2nd thereafter through and including January 2, 1987, certifying that he has not received the credit due on such date from Dot-Winslow Properties, Inc. The letter of credit provided for transferability by stating that: Should you desire to transfer your interest in this credit, this instrument should be returned for appropriate endorsement, accompanied by your letter of transfer. Your signature on the letter of transfer must be verified by a national bank. We hereby agree with drawers, endorsers *648 and bona fide holders of drafts negotiated under and in compliance with the terms of this credit that the same will be duly honored upon presentation to Drawee if drawn and negotiated on or before January 2, 1988. Dot-Winslow did not make its annual payments due to petitioner on January 2 of 1978, 1979, 1980, and 1981, respectively. On all four occasions of default, petitioner complied with the requirements of the letter of credit and received payments of $37,894.89 from the Bank each time. On January 6, 1982, petitioner received payment from Dot-Winslow in the form of a check in the amount of $37,894.89 drawn by Winslow R. Chamberlain Companies on its account at the Bank. On all five of these occasions of payment, the Bank advanced an annual amount of $37,894.89 to Dot-Winslow. This was true whether payment to petitioner was made by the Bank or by Dot-Winslow. Petitioners reported the sale of property to Dot-Winslow on their 1977 income tax return. Because they treated the transaction as an installment sale, petitioners included as current income only the portion of their capital gain which they attributed to the taxable year 1977. They subsequently included the installments *649 received in 1978 through 1982 on their returns for those respective years. However, respondent disallowed the installment sale treatment claimed on petitioners' 1977 return and asserted a deficiency for that year equal to the balance of the income tax due on the entire gain from the sale. Petitioners assert that the installment sale method of reporting income, authorized for sales of real property by the general rule of section 453(b)(1)(A), [3] is available despite the receipt of the Bank's letter of credit as security for Dot-Winslow's installment payments. Respondent, on the other hand, maintains that the limitation of section 453(b)(2) disqualifies petitioners from section 453(b)(1) treatent because the fair market value of the letter of credit must be included in income when received in 1977. *650 Section 1001(a) provides that the gain from the sale of property shall be the excess of the amount realized therefrom over the adjusted basis of the property. Section 1001(b) provides that the amount realized shall be the sum of any money received plus "the fair market value of the property (other than money) received." Section 1001(c) requires recognition of the entire amount realized "[e]xcept as otherwise provided in this subtitle." Section 453 is one of several Code sections which "otherwise provides" for immediate recognition of realized gain.However, section 453(b)(2) limits the availability of installment reporting by disqualifying certain transactions. Under section 453(b)(2)(B), a transaction does not qualify if, in the taxable year of sale, payments exceed 30 percent of the selling price. Petitioner received $30,000 cash in the year of sale. He also received Dot-Winslow's promise to pay an additional $270,000 over a ten-year period and a letter of credit from the Bank. If the fair market value of the letter of credit is not considered as a payment received in 1977, then *651 petitioner clearly did not receive payments in excess of the 30 percent allowed; by contrast, if the letter is viewed as a cash equivalent or evidence of constructive receipt of sales proceeds, then petitioner is disqualified under section 453(b)(2)(B). Resolution of this dispute turns on classification of the Bank's letter of credit either as a security arrangement or as a payment of the purchase price. In Griffith v. Commissioner,73 T.C. 933 (1980), sellers of cotton were disqualified from the use of section 453 where the balance due under a sales contract was secured by a bank's irrevocable letter of credit. The sellers were found there to have received the equivalent of cash in the year of sale. Our conclusion in Griffith was premised on our finding that, in substance, the letter of credit functioned not merely as security for an existing obligation of the purchaser, but rather as an economic substitute for the obligation itself. Griffith,supra at 943. Our examination of the particular facts and circumstances of the instant case requires here a contrastive and distinctive finding. For the reasons discussed below, we find that substance *652 comported with form and the Bank's letter of credit served only to secure payment of Dot-Winslow's ongoing obligation to petitioner. A series of cases involving escrow deposits preceded the Griffith opinion, including Pozzi v. Commissioner,49 T.C. 119 (1967), Oden v. Commissioner,56 T.C. 569 (1971), and Porterfield v. Commissioner,73 T.C. 91 (1979). In both Pozzi and Oden, installment sale treatment was denied where factual analysis led to the conclusion that sellers were no longer looking to purchasers for payment, but instead expected to collect from certificates of deposit which the purchasers had placed in escrow. By contrast, section 453(b) was found applicable in Porterfield where an escrow arrangement was found to serve as mere security for the performance of the purchaser's underlying obligation. The Griffith opinion also relied heavily on Watson v. Commissioner,69 T.C. 544 (1978), affd. 613 F.2d 594 (5th Cir. 1980), in which a commercial bank letter of credit was held to be a cash equivalent when received pursuant to a deferred payment agreement. This letter, *653 however, was issued only after the purchaser had transferred to the issuing bank the full amount of the purchase price. Watson,supra at 550. Viewing Griffith in the context of these cases, it appears there is a fine line between cases in which letters of credit serve as security and those in which letters of credit constitute cash equivalents. The crucial factor differentiating the two types of arrangements is the economic effect of the letters. In Griffith,supra at 943, we concluded: We are not satisfied that the petitioners regarded the letter of credit merely as security for the obligation of [the purchaser]; it seems that the letter of credit in this case served the same economic effect as the escrow arrangement in Oden.
In Griffith, as well as in Pozzi and Oden, we properly denied the use of the installment method of reporting where periodic payments to the seller would occur without any need for corresponding payments by the purchaser. In all of those cases, the purchaser parted with the full amount of the purchase price in *654 the year of sale, either by furnishing certificates of deposit or advancing cash to the bank issuing the letter of credit. Thus, in all those cases, the purchaser had fully extinguished its payment obligation in the year of sale. The letter of credit functioned as a payment device through which a bank, serving as intermediary, would distribute to a seller funds already paid by a purchaser. This type of arrangement is not, in substance, the same as a security arrangement under which the underlying payment obligation remains with the purchaser. This difference in substance distinguished Porterfield from Griffith and now distinguishes Griffith from the case before us. From the record before us, we cannot but infer that the parties regarded the Bank's letter of credit merely as security and that it functioned as such. Section 453 seeks to correlate receipt of proceeds with the tax liability for the gain attributable to those proceeds. In theory, a taxpayer should be able to pay the taxes due as a result of a particular transaction from the funds received therefrom. When payment is postponed, section 453 allows the correlative tax liability to be postponed. The use *655 of intermediaries as escrow agents presents the possibility of exploitation of section 453 where, although full payment has been made, receipt of payment is postponed to avoid taxes. In the instant case, there is no danger of such an abuse of section 453. The facts indicate that business reasons motivated the adoption of an installment sale and the Bank's letter of credit as security therefor. This is not a situation wherein the Bank was interposed as a payment vehicle simply to allow petitioner to avail himself of the installment method of reporting income. Instead, Dot-Winslow's construction financing needs prevented petitioner from retaining a security interest in the property, making it necessary for him to seek some other sort of security. Under these circumstances, we are convinced that the Bank's letter of credit, both in form and in substance, served only as security for Dot-Winslow's payment obligation. Securing a purchaser's indebtedness with collateral, whether in the form of a bank letter of credit or otherwise, does not transform the debt into a completed payment. See *656 Sprague v. United States,627 F.2d 1044, 1048 (10th Cir. 1980). In analyzing the payment arrangements in various cases, we must look to the substance of each transaction as it acutually occurred. Frank Lyon Co. v. United States,435 U.S. 561, 577 (1978). As we said in our recent opinion in Laughinghouse v. Commissioner, 80 T.C.     (Feb. 15, 1983) (sl. op at 19): Parties have the right to choose particular structures for their transactions and where those transactions serve purposes other than tax avoidance, courts are loath to disturb them. * * * Without more evidence supporting respondent's assertions, we cannot ignore the legal effects of the transaction as it was structured. Because we have found here that the Bank's letter of credit functioned only as security, petitioner is not disqualified from the use of section 453 by reason of the restriction of section 453(b)(2)(B). Neither Griffith nor any of its predecessors established an iron-clad rule that the receipt of a letter of credit constitutes payment. These cases held only that, *657 under particular circumstances, letters of credit constituted payment because these letters were cash equivalents which reflected a shift of the payment obligation from the purchaser to the bank.Therefore, their function extended beyond that of a permissible security arrangement. Where this shifting is not found, there is no justification for treating the letter of credit as payment received. Thus, our finding that the letter of credit was intended and functioned only as security neither alters nor is inconsistent with our conclusion in Griffith.
The transferability of the Bank's letter of credit has been cited by respondent in support of his theory of constructive receipt. It is conceivable that petitioner might have raised cash by selling the letter at its fair market value. However, the same is true of the payment obligation itself. Any transferable right to future income might be converted into current income through a sale. The Code anticipates the sale of installment obligations and imposes tax thereon. [4] In the instant case, any sale of the letter of credit would necessarily *658 be coupled with a sale of the underlying obligation since, under the terms of the letter, collection was possible only upon Dot-Winslow's default on the original obligation. Petitioner had no right to demand anything but annual installments as due under the purchase agreement; any subsequent purchaser of the agreement would likewise be bound by those terms. If such a sale had occurred, section 453(d) would have determined its tax consequences. Where such a sale did not occur, however, our analysis of the tax results under section 453 is not affected. In determining the tax results of any transaction, we cannot speculate as to differing results which might have arisen under differing circumstances. Rather, "a transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred." Frank Lyon Co. v. United States,supra at 577; Laughinghouse v. Commissioner,supra.
*659 In addition, respondent argues that petitioner cannot exclude the value of the letter of credit in any event because it is not an evidence of indebtedness of the purchaser. This argument is without merit. The required evidence of indebtedness of the purchaser is found in the sales contract itself, not in the letter of credit which secures the obligations created thereunder. Section 453(b)(2)(B) has no requirement that separate notes be transferred to petitioner to evidence Dot-Winslow's indebtedness. Respondent also objects to the admission of evidence concerning Dot-Winslow's relationship with the Bank as irrelevant.We do not agree. The evidence demonstrates the security nature of the agreement and establishes the fact that Dot-Winslow did not actually pay installments required under the contract until due. Dot-Winslow signed an unsecured demand note to cover the Bank's extension of credit on its behalf, but no funds, certificates, or other collateral were transferred to the Bank. Furthermore, the interest rate charged to Dot-Winslow by the Bank was greater than that due from Dot-Winslow to petitioner, and the Bank's rate rose from 9 1/2 percent to 12 1/2 percent and eventually *660 to 19 percent. This pattern demonstrates that dealings between Dot-Winslow and the Bank were independent of the terms of the contract between Dot-Winslow and petitioner. This supports our conclusion that Dot-Winslow remained the principal obligor under the sales contract and that the Bank functioned not as a substitute obligor, but only as a surety of Dot-Winslow's obligation to petitioner. Finally, we note that the Installment Sales Revision Act of 1980, Pub. L. 96-471, 94 Stat. 2247, 1980-2 C.B. 489, obviates the future need for the type of analysis required in the instant case and its predecessors. That Act amends and clarifies section 453 to specifically exclude guaranteed future payments from calculation of payments received in the year of sale. [5] For transactions occuring after the Act's effective date of October 20, 1980, it is clear that the issuance of a bank letter of credit does not constitute current payment. The sale in the present case, of course, occurred before this change in the law and cannot be affected thereby. *661 We have considered other arguments advanced by respondent and found them to be unpersuasive. Accordingly, we hold that petitioners were entitled to report their gain on the 1977 sale of property under the installment method authorized by section 453. To reflect the foregoing, Decision will be entered for the petitioners.
Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue.↩
2. The purchase agreement and the amendment and addendum thereto were signed by both William B. Korstad and Dorothy A. Korstad. However, the agreement and amendment themselves refer to William B. Korstad only as seller, the bank letter of credit securing payment was issued to William B. Korstad only, and all subsequent transactions between petitioners and the issuing bank involved William B. Korstad only.↩
3. Section 453(b) provided: (b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.-- (1) GENERAL RULE.--Income from-- (A) a sale or other disposition of real property * * * may (under regulations prescribed by the Secretary) be returned on the basis and in the manner prescribed in subsection (a). (2) LIMITATION.--Paragraph (1) shall apply only if in the taxable year of the sale or other disposition-- (A) there are no payments, or (B) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.↩
4. Sec. 453(d)↩ [currently sec. 453B] sets forth the rules for taxation of "gain or loss on disposition of installment obligations."
5. Sec. 453(f)(3), added in 1980, includes in its definition of "payment" the clear statement that: "* * * the term 'payment' does not include the receipt of evidences of indebtedness of the person acquiring the property (whether or not payment of such indebtedness is guaranteed by another person↩)." (Emphasis added.)